J-S34014-18
J-S34015-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.C.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.M., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 33 WDA 2018 |

Appeal from the Order December 4, 2017
In the Court of Common Pleas of Allegheny County Family Court at
No(s): CP-02-AP-0000103-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.M., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 34 WDA 2018 |

Appeal from the Order December 4, 2017
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000104-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: M.C.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.M., BIRTH MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 35 WDA 2018 |

Appeal from the Order Entered December 1, 2017
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000103-2017

J-S34014-18
J-S34015-18

| IN THE INTEREST OF: M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.M., BIRTH MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 36 WDA 2018 |

Appeal from the Order December 1, 2017
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000104-2017

BEFORE:   BOWES, J., STABILE, J., and STRASSBURGER[*], J.

MEMORANDUM BY BOWES, J.:                    **FILED JULY 17, 2018**

B.M. ("Father") and S.M. ("Mother") appeal from the orders entered December 4, 2017, in the Court of Common Pleas of Allegheny County, that granted the petitions of the Allegheny County Office of Children, Youth and Families ("CYF"), to involuntarily terminate their parental rights to two daughters, M.C.M. and M.M.[1]  After careful review, we affirm.

M.C.M. was born in May 2010.  M.M. was born in October 2013.  CYF became involved with M.C.M. and M.M. in the fall of 2014.  N.T., 12/1/17, at

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] On January 11, 2018, this Court, acting *sua sponte*, consolidated Mother's two appeals with regard to the termination of her parental rights to M.C.M. and M.M.  The order also consolidated Father's two appeals with regard to the termination of his parental rights to the children, and listed his appeals to be decided consecutively with Mother's appeals.  The trial court discussed all of the appeals in a single opinion entered March 6, 2018.  We shall likewise review these matters in a single memorandum for ease of disposition.

- 2 -

53. CYF received two referrals. *Id*. One indicated that a caretaker burned M.M. The other asserted that M.C.M. and M.M. were left home alone. *Id*. CYF closed both of the 2014 referrals at the intake level. *Id*. Subsequently, CYF received a referral in February 2016 alleging that Father was incarcerated, and Mother was caring for M.C.M. and M.M. *Id*. at 52. The referral claimed Mother used heroin, Suboxone and crack. *Id*. As a result, M.C.M. was often outdoors by herself, and the home had needles within reach of M.C.M. and M.M. *Id*. The CYF investigation confirmed Mother's use of Suboxone and heroin. *Id*. at 53. CYF also confirmed Father was attending inpatient drug and alcohol treatment. *Id*. at 54.

CYF met with Mother, M.C.M., and M.M. on multiple occasions. *Id*. Mother requested assistance obtaining substance abuse and mental health treatment. *Id*. CYF implemented a safety plan developed with Mother on March 24, 2016. *Id*. at 55. When CYF met with Mother on March 24, 2016, Mother admitted daily or near daily substance abuse. *Id*. CYF referred Mother to Mercy Behavioral Health for mental health treatment. *Id*. at 55. CYF also located a bed for Mother at Family Links, an inpatient drug and alcohol treatment center where Mother could have M.C.M. and M.M. with her. *Id*. Because of the age of the children, the safety plan required Mother to have daily phone contact with CYF. *Id*. at 55-56. Mother did not maintain contact with CYF. *Id*. at 56. CYF conducted two unannounced home visits. *Id*. When CYF conducted the visits, the caregiver for M.C.M. and M.M. was an individual

Mother had identified as unsafe to be around M.C.M. and M.M. *Id*. As a result, CYF obtained an order for emergency protective custody of M.C.M. and M.M. on March 31, 2016. *Id*. On May 18, 2016, the orphans' court adjudicated M.C.M. and M.M. dependent. *Id*. at 58-59. The order required Mother and Father to undergo drug and alcohol treatment, submit weekly random urine screens, attend parenting classes, attend domestic violence classes, and obtain appropriate housing. The order permitted liberal supervised visitation.

On June 21, 2017, CYF filed petitions to involuntarily terminate Mother's and Father's parental rights to M.C.M. and M.M. The trial court conducted the hearing on the petitions on December 1, 2017. CYF presented the testimony of clinical psychologist Dr. Neil Rosenblum, CYF supervisor Erin Snyder, and caseworker Marci Bolger. Father and Mother both testified on their own behalves. M.C.M. and M.M., represented by Eli Zlokas, Esquire, did not call any witnesses, but did cross-examine Dr. Rosenblum, Ms. Snyder, and Father.[2] By separate orders dated December 1, 2017, and entered December 4, 2017, the trial court involuntarily terminated the parental rights of Mother

_____

[2] On September 6, 2017, in separate orders relating to M.C.M. and M.M., the trial court appointed Attorney Zlokas to "represent the child's legal interests." Orders of Court, 9/6/17. At the hearing, Attorney Zlokas informed the court he "did have an opportunity to view the children and interview the children in their foster home. That happened on November 12th, Your Honor." N.T., 12/1/17, at 185. He also argued to the court "[t]hese adults have made their choice. These children have made their choice, Your Honor. They want to stay where they're at. Adoption serves their needs." *Id*. at 186.

and Father to M.C.M. and M.M.[3]   The trial court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).   The trial court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).

Thereafter, on January 3, 2018, Mother and Father filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).[4]

Father raises the following issues for review:

1. Is the [t]rial [c]ourt's finding a grounds for [i]nvoluntary [t]ermination of [a]ppellant's [p]arental [r]ights under 23 Pa.C.S.A. § 2511(a)(2), § 2511(a)(5) and § 2511(a)(8) proven by a showing of clear and convincing evidence?

2. Is the [t]rial [c]ourt's finding that [t]ermination of [p]arental [r]ights serves the developmental, physical and emotional needs and welfare of M.C.M. and M.M.] proved by clear and convincing evidence as required by 23 Pa.C.S.A. § 2511(b)?

Father's brief at 8.

Mother raises the following issue for review:

_____

[3]  The trial court also involuntarily terminated the parental rights of unknown father of M.C.M.  The unknown father has not filed an appeal and is not a party to the instant appeal.

[4] Father's notice of appeal, with respect to the order involuntarily terminating his parental rights to M.M., is not included in the certified record for the docket involving M.M.  However, Father's notice of appeal, captioned with both the dockets for M.C.M. and M.M., is included in the certified record at the docket involving M.C.M.  Accordingly, Father's appeal of the order involuntarily terminating his parental rights to M.M. is properly before this Court pursuant to Pa.R.A.P. 905(a)(4).

- 5 -

1. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the children pursuant to 23 Pa.C.S. § 2511(b)?

Mother's brief at 8.

We review these claims mindful of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(2), (5), and (8), as well as (b). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of § 2511(a) as well as § 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). With respect to Mother, she solely contests the trial court's finding of sufficient grounds as to § 2511(b). With regard to Father, we will focus our analysis on § 2511(a)(2), and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any

- 7 -

efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

Our Supreme Court set forth our inquiry under § 2511(a)(2) as follows:

As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012) (citations omitted).

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa.Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id*. at 340.

In addressing § 2511(a), the trial court concluded:

Evidence and testimony presented at the TPR hearing demonstrated that Father's extensive criminal history and his repeated periods of imprisonment, together with his ongoing substance abuse, has precluded him from being able to adequately provide for the care of his children. CYF presented credible evidence and testimony that following the children's removal from parental care, CYF provided Father with various services to assist him in improving his ability to parent, and to address his drug and alcohol problems, with limited success. Following Father's most recent release from imprisonment, Father received drug and alcohol inpatient treatment. However, as recently as August, 2017, Father incurred new criminal charges for alcohol-related incidents, indicating a continued inability to successfully manage his substance abuse in a manner that would permit him to provide the children with stable and appropriate parental care. Additionally, following his release from prison, Father was unable to secure and maintain housing appropriate for visits with the children, and made little progress towards creating a stable home environment for the children. Furthermore, although this [c]ourt granted Father visitation with the children, Father attended only 27 of 79 scheduled visits. The inconsistency of his visits has interfered with the ability of the children to develop a consistent and stable bond with Father, and further evidences a failure by Father to become a reliable parental figure and demonstrate that he has made parenting of his children a priority. In addition, CYF presented credible testimony that Father has difficulty maintaining stable employment, further impeding his ability to provide for the needs of his children.

This [c]ourt is cognizant of Father's positive qualities, including the fact that Father accepts responsibility for his shortcomings, in particular his substance abuse problems and the unhealthy family environment that he created for his children. In addition, this [c]ourt is aware that Father has a good relationship with the children with whom he is patient and loving. However, Father has difficulty maintaining his relationship with the children because of his repeated criminal conduct resulting in incarceration. Moreover, Father's substance abuse which contributed to the removal of the children from parental care, continues to interfere with his ability to care and provide for them, and Father himself admitted to a history of ongoing drug and alcohol abuse which he has been unable to successfully address.

Trial Court Opinion, 3/6/18, at unnumbered 4-5.

Father asserts "[t]he primary reason for removal of [M.C.M. and M.M.] from their parents' care were the Drug and Alcohol issues of both parents." Father's brief at 15. Father argues that he completed two inpatient drug and alcohol treatments successfully and followed up with outpatient treatment. *Id*. at 16. He also contends that his drug screens were negative. *Id*. at 16-17. Father also points to alleged inconsistencies with regard to housing and visitation. *Id*. at 18-19. While Father acknowledges that he did not participate in domestic violence or mental health programs, he asserts that he did engage in an in-home parenting program. *Id*. at 17-18. Accordingly, Father contends that CYF failed to meet its burden pursuant to 23 Pa.C.S. § 2511(a)(2).

Our review of the certified record supports the trial court's finding of sufficient grounds for termination under § 2511(a)(2). Father received a referral to Arsenal for parenting services, but did not provide any documentation that he completed the program, although Father did discuss parenting with an in-home provider on several occasions. *Id*. at 84. Father did not participate in mental health programming. *Id*. at 87. Father attended an initial appointment for a domestic violence program. *Id*. at 88. He did not return. *Id*. Father attended 27 of 79 scheduled visits. *Id* at 90. Further, while Father asserts that he successfully completed inpatient and outpatient drug and alcohol treatment, the record does not support his successful completion of treatment. The testimony at trial indicated Father

unsuccessfully completed outpatient drug and alcohol programming. *Id*. at 86. Father testified that his primary drug of choice is alcohol. *Id*. at 158. At the time of the hearing, Father acknowledged a pending driving under the influence charge. *Id*. at 147. The exhibits offered by CYF, and admitted into evidence, show this charge arose out of an August 2017 traffic stop. *See* Exhibit CYF 4. When questioned on his relapse, Father testified he "just couldn't deal with my daughters being gone. The first three days - - three days after I got out, I had my first visit and I just lost it." N.T., 12/1/17, at 155-56. Father acknowledged drinking as recently as the week before the termination hearing. *Id*. at 159.

Dr. Rosenblum performed a series of evaluations with regard to Father, M.C.M., M.M. and the foster parents.[5] Dr. Rosenblum testified that Father acknowledged that alcohol had been a continuing problem for him for quite some time. *Id*. at 12. With regard to treatment, Father did not deny that he did not follow through regularly with drug and alcohol treatment. *Id*. at 13-14. Further, Father "estimated that he's been in the Allegheny County Jail 12 times" and has a "very long and extensive history of criminal activity." *Id*. at 10. At the time of the hearing, Father acknowledged being imprisoned most recently from January 2017 to May 2017. *Id*. at 147, 150. Father recognized "that there was a lot of chaos." *Id*. at 15. Dr. Rosenblum testified M.C.M.

---

[5] Mother did not appear for her appointment with Dr. Rosenblum.

- 11 -

knew "that [Mother and Father] would drink and smoke and fight one another." *Id*. at 20. M.C.M. recalled "her dad would say bad words and be mean to her mom and hit her, and that the police would come to the house and that she recalled that her dad got arrested." *Id*. at 17. M.C.M. indicated to Dr. Rosenblum "she did not feel safe when she lived with her mother and her father." *Id*.

At the time of the evaluation in September of 2017, Father did not have employment. *Id*. at 11. At the hearing, Father testified he worked at a grocery store. *Id*. at 152. Further, he did not have housing. *Id*. at 11. Instead, he lived with his grandmother and hoped to relocate to Sewickley. *Id*. at 11-12. CYF assessed Father's housing and found it inappropriate for visits. *Id*. at 84.

As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). The record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused M.C.M. and M.M. to be without essential parental control or subsistence necessary for their physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003). Moreover, Father cannot or will not remedy

this situation. *See id*. Accordingly, the certified record supports the trial court's finding that CYF established the statutory grounds to terminate Father's parental rights pursuant to § 2511(a)(2).

Having found that grounds exist to terminate parental rights under § 2511(a), we assess the orphans' court's assessment of the children's needs and welfare pursuant to § 2511(b). This Court has stated that the focus in terminating parental rights under § 2511(a) is on the parent, but it is on the child pursuant to § 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa.Super. 2008) (*en banc*). In reviewing the evidence in support of termination under § 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [533 Pa. 115, 121, 620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal

- 13 -

citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa.Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa.Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a

permanent, healthy, safe environment." ***In re B.,N.M.***, 856 A.2d 847, 856

(Pa.Super. 2004) (internal citations omitted).

The trial court found termination under § 2511(b) appropriate, writing:

Upon careful review of the evidence and testimony presented at the TPR hearing, this [c]ourt concluded that termination of Mother and Father's parental rights best serves the children's physical and emotional needs and welfare. Mother and Father's parental deficits, criminal conduct, and ongoing substance abuse has detrimentally affected the children, and continues to do so. Dr. Rosenblum, a licensed psychologist who conducted an evaluation of M.C.M., testified that M.C.M. reported to him that her parents did not take care of her, and that her mother "drank alcohol all of the time" which "made her act funny." N.T., 12/1/16, at 17. She reported that her Father would say "bad words and be mean" to Mother and "hit her", and that police sometimes came to the home. ***Id***. She stated that she did not feel safe when she lived with Mother and Father. With respect to M.C.M.'s, mental health, Dr. Rosenblum opined that she suffers from nervousness and anxiety resulting from her upbringing with her parents, and has been affected by past traumatic experiences including exposure to her parents' substance abuse, domestic violence, and incarceration.

At the time of the TPR hearing, M.C.M. had been in the same foster home for a year and a half, and strongly stated to Dr. Rosenblum that she felt safe there. According to Dr. Rosenblum, M.C.M. evidenced that she received love, attention and stability from her foster parents, from which she was benefitting. Dr. Rosenblum reported that while M.C.M. cares about her parents, it was her foster parents who provided her with emotional stability and security. With regard to her relationship with Father, M.C.M. reported that her father informed her that he would like her to return home, but she stated firmly to Dr. Rosenblum that she wants to stay at the foster home where she feels safe. Dr. Rosenblum reported that M.C.M. is emotionally connected to foster parents. Additionally, Dr. Rosenblum testified credibly that Mother and Father's inability to "stabilize their lives" has created "anxiety and uncertainty" for the children and prevented them from achieving "security" that would allow then to move their lives forward in a positive direction. N.T., 12/1/17 at 38-39.

Following an interactional evaluation with foster parents and both children, Dr. Rosenblum reported that the children received love and attention from their foster parents with whom both children were relaxed and affectionate, and that the children feel very much at home with and are attached to their foster parents. The foster parents did report to Dr. Rosenblum that because of the inconsistency of visitation with Mother and Father, the children experience confusion as to what to expect from their parents, and it impairs their ability to feel stable and secure.

It appears from the foregoing that the effects of Mother and Father's continued substance abuse and criminal activity, along with their limited contact with the children, has [affected] and continues to detrimentally affect the children. The children have developed a meaningful and affectionate relationship with their foster parents, who provide for the emotional, physical, and mental health needs, and with whom the children have a stable and loving familial relationship. While Dr. Rosenblum reported that M.C.M. would likely have some difficulty not seeing her parents again, and has affection for them, termination of the parental relationship would not cause irreparable harm. With respect to M.M., Dr. Rosenblum testified that she does not appear connected to her parents or to retain attachment to them as parental figures, indicating that termination would not detrimentally affect her.

Although Father and Mother clearly love their children, their behaviors have caused the children considerable trauma. The uncertainty and upheaval caused by Mother and Father's intermittent entry and departure from the children's lives due to repeated incarcerations and substance abuse has caused the children anxiety, contributes to an ongoing lack of stability in the children's lives, and interferes with the development of a healthy parent-child relationship. The inconsistent visitation by Mother and Father, coupled with their repeated inability to provide the children with a stable environment has negatively affected both M.M. and M.C.M. Moreover, Mother admitted to ongoing problems with substance abuse and her recent incarceration, as well as Father's most recent charges for driving under the influence in August 2017 evidence continued failure by both Mother and Father to prioritize parenting, and provide stable, consistent care and support for the children.

> Evidence and testimony presented at the TPR hearing indicates that both children will continue to benefit from the stable, supportive environment of their foster home. The children have bonded with their foster parents on whom the children rely and look to as parents, who provide the children with love and affection and who are able to meet their needs. Although the children, particularly M.C.M., may experience sadness at the loss of their parents, termination of parental rights would provide them with future stability and the opportunity to develop and thrive in a stable, loving environment in which their needs are being met in a manner that Father and Mother have not and continue to be unable to provide.

> After careful review of the testimony and evidence this [c]ourt concludes that CYF established by clear and convincing evidence that grounds existed for termination of Mother and Father's parental rights and that termination of their parental rights best served the needs and welfare of the children.

Trial Court Opinion, 3/6/2018, at unnumbered 6-9.

Mother and Father raise interrelated issues with regard to the trial court's termination of their parental rights pursuant to § 2511(b). Father asserts, "the [c]ourt erred in its finding that [CYF] proved by clear and convincing evidence that Termination of [Father's] Parental Rights best meets the needs and welfare of the Child as set forth in 23 Pa.C.S.A. § 2511(b)." Father's brief at 27. Further, Father highlights that M.C.M. and M.M. were happy to see him, his bond with M.C.M., and the fact that his interactions with the children were gentle, patient, and affectionate. *Id*. at 22. Father also asserts that M.C.M. and M.M. had difficulty separating from him after the evaluation. *Id*.

Mother identifies testimony "that at least the older child, M.[C.]M., may need some additional therapy to help understand that she may never again

have contact with Mother or Father." Mother's brief at 17. Accordingly, Mother argues "[t]he needs and welfare of the children, at least M.[C.]M., are best served by Mother and Father retaining their parental rights so future contact can be assured and the detrimental impact of termination avoided." *Id*. Mother acknowledges "[t]here was evidence establishing Mother's minimal contact with her children while in foster care, however Mother never stopped loving her children and continues to want what is best for them." *Id*. Mother concludes that she "believes [M.C.M. and M.M.] will be best served by ultimate placement with Father and that there is no benefit to terminating Mother's parental rights if Father's remain intact." *Id*. at 18.

Contrary to Mother's and Father's assertions, the certified record corroborates the trial court's analysis pursuant to § 2511(b). M.C.M. and M.M. have resided in the same foster home since April 2016. N.T., 12/1/17, at 62. The foster home is a pre-adoptive resource. *Id*. The foster parents, C.M. and C.M. ("Foster Parents"), have M.C.M. and M.M. involved in a lot of activities. *Id*. at 96. Further, the children call Foster Parents mom and dad. *Id*.

On direct examination, Mother's counsel questioned Mother regarding whether she believed M.C.M. and M.M. would be better served by Mother remaining in their lives or without her. Mother responded, "[r]ight now, I would say without me." *Id*. at 169. Mother expressed hope to have the children back with her "[w]hen I'm better. I'm not - - when I'm better." *Id*. At the time of the hearing, Mother acknowledged being incarcerated for at

least the next nine months. *Id*. at 165. Between March 2016 and May 2017, Mother visited M.C.M. and M.M. twice. *Id*. at 77. Further, the court entered aggravated circumstances orders on July 5, 2017 for her failure to maintain substantial and continuing contact for six months. Aggravated Circumstances Orders, 7/5/17. Mother did not obtain appropriate housing, did not maintain contact with CYF, did not engage in parenting services, continued to abuse drugs, failed to address her mental health issues, and did not undergo domestic violence counseling. N.T., 12/1/17*,* at 77-82.

Father testified, "I love my kids dearly and I don't deserve to not have them." *Id*. at 153. Father believed he attended every visit since his release from jail except for one. *Id*. at 149-50. Ms. Snyder testified that two days before the termination hearing Father attended a visit and called the caseworker "the devil." *Id*. at 101. This upset M.C.M. and she stopped interacting with Father and he did not attempt to re-engage her. *Id*.

In performing his evaluation, Dr. Rosenblum interviewed M.C.M. She told him "her parents didn't take care of her." *Id*. at 16. M.C.M. described her mom as nice but indicated that Mother would "drink alcohol all the time, and it made her act funny." *Id*. at 17. M.C.M. also discussed the domestic violence that she was exposed to, indicating that "her dad would say bad words and be mean to her mom and hit her, and that the police would come to the house and that she recalled that her dad got arrested." *Id*. M.C.M. reported "she did not feel safe when she lived with her mother and her father."

*Id*. M.C.M. preferred to stay with Foster Parents, because "they're nice to her and don't say bad words and treat her well." *Id*. at 17-18. M.C.M. informed Dr. Rosenblum "she is happy where she is and this is where she wants to stay." *Id*. at 18. M.C.M. is very connected with Foster Parents. *Id*. at 45. They are the people who make M.C.M. feel happy, and from whom she gets love and attention. *Id*. at 20. Dr. Rosenblum believed that M.C.M. has a primary attachment to Foster Parents. *Id*. Dr. Rosenblum testified that Foster Parents have made M.C.M. feel safe and provide her with the security and stability that M.C.M. did not experience when living with Mother and Father. *Id*. at 20-21.

While Dr. Rosenblum did not doubt that Father cared about his daughters, he observed that M.M. did not want to connect or interact with Father very much. *Id*. at 21-22. Dr. Rosenblum testified that M.C.M. and M.M. went through a year-and-a-half where they had very minimal contact with Mother and intermittent contact with Father. *Id*. at 24. Both M.C.M. and M.M. transferred their attachments to Foster Parents. *Id*. Dr. Rosenblum opined that both M.C.M. and M.M. have "moved on and connected to a new family and a new direction in their life." *Id*. at 25. Dr. Rosenblum believed M.C.M. has some bond with Father but was not sure that M.M. had such a bond. *Id.* at 29. Dr. Rosenblum opined M.C.M. may need some additional therapy due to the fact she may not have contact with her birth parents, but he did not believe that it would cause M.C.M. major trauma. *Id.* at 25. Dr.

Rosenblum believed termination of Mother's and Father's parental rights would not cause irreparable harm or psychological damage that could not be addressed. *Id.* at 26.

Thus, as confirmed by the record, termination of Mother's and Father's parental rights serves M.C.M.'s and M.M.'s developmental, physical and emotional needs and welfare and was proper pursuant to § 2511(b). While Mother and Father may profess to love their children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. At the time of the hearing, M.C.M. and M.M. resided with Foster Parents for almost two years and are thriving. They are entitled to permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted). Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's and Father's parental rights.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  7/17/2018